UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

KAYODE SOTONWA,

      Plaintiff,

v.

DENIS MCDONOUGH, in his official
capacity as Secretary of the United States
Department of Veteran's Affairs,

      Defendant.

No. 1:22-CV-189-H

**MEMORANDUM OPINION AND ORDER
GRANTING SUMMARY JUDGMENT**

The plaintiff, Kayode Sotonwa, a physician, alleges that his employer, the VA, discriminated against him and harassed him because of his race, color, national origin, gender, and age and retaliated against him for engaging in a protected activity. Particularly, the plaintiff's remaining claims assert that the VA: (1) harassed him and retaliated against him by investigating allegations of harassment made against him by other VA employees, Dkt. No. 1 ¶ 33; and (2) discriminated and retaliated against him by demoting him, *id.* ¶ 34.

Before the Court is the defendant's summary judgment motion on the plaintiff's remaining discrimination, harassment, and retaliation claims under Title VII of the Civil Rights Act of 1964 (Title VII) and the Age Discrimination in Employment Act (ADEA). Dkt. No. 32. The Court grants the motion in full. First, the plaintiff cannot establish a prima facie case of harassment. Second, even if he could establish a prima facie case of discrimination or retaliation, he has not produced evidence that creates a genuine issue of fact as to whether the defendant's proffered reasons for the investigation and his demotion were a pretext for discrimination or retaliation.

1.    **Factual and Procedural Background**

    A.    **The West Texas VA's Leadership**

At all times relevant to his claims, the plaintiff has been employed at the West Texas VA Health Care System in Big Spring, Texas (West Texas VA). *See* Dkt. No. 29-1 at 8. The West Texas VA provides medical and mental healthcare to the veteran population of West Texas. *Id.* at 5. Within the organizational hierarchy of the West Texas VA, the Director is the top leadership position and oversees the facility, staff, and programs. *Id.* at 2, 4. The Chief of Staff is second-in-command and oversees the clinical patient care—including medical and operational components—and reports to the Director. *Id.* The third-tier of leadership at the West Texas VA consists of multiple Associate Chiefs of Staff placed over particular service areas, including an Associate Chief of Staff for Ambulatory Care. *Id.* at 3, 4. The Associate Chiefs of Staff report to the Chief of Staff. *Id.*

In November 2015, Kalautie JangDhari became the Director of the West Texas VA and the plaintiff's second-level supervisor. *Id.* at 8. At that time, Dr. Neil Nusbaum served as the Chief of Staff and the plaintiff's direct supervisor, and he remained in this position until September 2017. *Id.* Following Nusbaum's departure, several physicians served as Interim Chief of Staff. *Id.* Notably, Dr. D'Arcie Chitwood was serving as the Interim Chief of Staff when the VA received an internal complaint about the plaintiff in January 2018, and Dr. Nassir Hussain was serving as the Interim Chief of Staff when the plaintiff was reassigned to the position of Staff Physician in March 2018 pending investigation of the complaint. *Id.* at 9, 10; *see also* Dkt. No. 29-2 at 6.

Shortly thereafter, in April 2018, Dr. Jeff Hastings was temporarily appointed Acting Chief of Staff where he served until he returned to his permanent position at another VA

medical facility on October 1, 2018. Dkt. No. 29-6 at 2. Hastings was the Acting Chief of Staff and the plaintiff's direct supervisor at the time of the plaintiff's permanent demotion to Staff Physician in September 2018. *Id.* Following the plaintiff's demotion, Dr. Shawkat Dhanani was hired as the permanent Chief of Staff in January 2019. Dkt. No. 29-1 at 8.

### B.    Plaintiff's Employment History with the VA

The plaintiff was initially hired by the VA in 2003 to work as a physician in a medical facility in Florida. *Id.* He resigned in 2007 and was re-hired in 2010 as a physician at a medical facility in Missouri. *Id.* In August 2013, the VA promoted the plaintiff to Associate Chief of Staff, Ambulatory Services at the West Texas VA. *Id.* The plaintiff worked in this position until the VA received the internal complaint against him in 2018. *Id.* at 10. Additionally, prior to 2018, the plaintiff occasionally served as Acting Chief of Staff for a few days at a time in the event the permanent Chief of Staff was absent. *Id.* at 2–3, 8.

During his early employment at the West Texas VA, the plaintiff received excellent feedback on his clinical performance and medical acumen. Dkt. No. 29-3 at 4, 8. However, with respect to leadership and communication skills, his performance review in 2014—despite noting a "[f]ully [s]uccessful" rating in "[l]eading [p]eople"—stated that the plaintiff "had some issues with uniting and communicating with all [of] his staff." *Id.* at 4. Additionally, the review noted "interactions with fellow service Chief's[sic] and his communication with his employees" as areas of improvement. *Id.* And a performance review in 2016 suggested that the plaintiff "focus on [his] soft skills." *Id.* at 6.

Also of note, in 2017, the plaintiff filed an EEO complaint claiming that he was discriminated against when the Chief Health Information Officer awarded a co-worker a larger bonus than he awarded the plaintiff. Dkt. No. 29-5 at 2. The complaint was

ultimately resolved in favor of the VA.  *Id.* at 3.  JangDhari, as the Director, was notified of the plaintiff's EEO complaint via letter in 2017.  *Id.* at 2.

### C.    The Harassment Complaint Against the Plaintiff

In January 2018, two female VA employees filed a complaint with the VA's internal police, claiming that the plaintiff had sexually assaulted them when conducting their required physical fitness examinations.  Dkt. Nos. 29-1 at 9; 29-3 at 22.  The VA's internal police department investigated the complaints to determine whether the plaintiff had potentially engaged in criminal conduct and should be referred to proper authorities.  Dkt. No. 29-1 at 9.  Chitwood was serving a 60-day term as the Acting Chief of Staff at the time the allegations were made against the plaintiff.  Dkt. No. 38-2 at 75.  As his direct supervisor, Chitwood made the initial decision to temporarily remove the plaintiff from patient care in January 2018 while the allegations were investigated.  *Id.* at 75–76.  In due course, the police determined that the plaintiff had not engaged in criminal conduct.  Dkt. No. 29-2 at 4.

Following the police's investigation, JangDhari—still serving as the West Texas VA Director—formed an independent Administrative Investigation Board (AIB) in March 2018 to determine if the plaintiff had engaged in non-criminal conduct that violated the VA's policies and procedures.  Dkt. Nos. 29-1 at 6, 9–10; 29-9 at 4–6.  The AIB was comprised of five individuals—three physicians from other VA locations, a nurse from the regional office for the West Texas facility, and a Human Resources Technical Advisor from the West Texas VA.  Dkt. Nos. 29-1 at 10; 29-3 at 17.  The AIB was asked to "conduct[] a thorough investigation into the facts and circumstances" and determine whether the plaintiff "[f]ail[ed] to follow policy/procedures during an employee physical" or created "a hostile

– 4 –

work environment for peers and subordinates involving but not limited to sexual harassment and discrimination during an examination." Dkt. No. 29-3 at 19. Apart from the scope of the investigation stated in the charge letter to the AIB, the AIB conducted the investigation without input from JangDhari. Dkt. No. 29-9 at 6–7.

The then-Interim Chief of Staff, Hussain, "temporarily detailed/reassigned" the plaintiff "to Consultative Care Service (Staff Physician)" on March 6, 2018, "pending the outcome of" the AIB's investigation. Dkt. No. 29-3 at 16. The letter to the plaintiff informing him of his change in position noted that "[t]his action is standard procedure and non-disciplinary in nature to protect all parties involved." *Id.* In fact, this reassignment did not change the plaintiff's permanent position or pay. Dkt. No. 29-1 at 10. At the time of the plaintiff's reassignment, Chitwood was assigned as Acting Associate Chief of Staff, Ambulatory Care, where she served until at least June 2019. Dkt. No. 38-1 at 23. In June 2019, a 66-year-old male, Dr. Luis Chavez,[1] was hired as the permanent Associate Chief of Staff, Ambulatory Care. Dkt. No. 29-1 at 14–15.

**D. The AIB Report**

After conducting over twenty interviews with various medical and administrative VA staff members, on May 8, 2018, the AIB issued a report containing the results of its investigation. Dkt. Nos. 29-6 at 4; 29-3 at 21–36. The AIB report first detailed the scope of the investigation, the persons interviewed, and the allegations at issue. Dkt. No. 29-3 at 21–23. Next, the report stated detailed findings of fact related to: (1) the VA policies implicated by the scope of the investigation, *id.* at 23–25; (2) the allegations of sexual

---

[1] The plaintiff also asserts that Chavez is "brown, Hispanic[,] and not Nigerian born," but does not cite to any supporting authority. Dkt. No. 43 at 19.

harassment against the plaintiff, *id.* at 25–31; (3) the plaintiff's leadership as an administrator, *id.* at 31–32; and (4) the plaintiff's experience and training, *id.* at 32–33. Each finding of fact referenced supporting documentation. *See id.* at 21–33.

Following the findings of fact, the report stated four conclusions made by the AIB. *Id.* at 33–35. First, the AIB found that "[t]he . . . exams [the plaintiff] performed on [the complainants] were inappropriate and more thorough [than] necessary[,] but there is no evidence of sexual harassment during either exam." *Id.* at 33. The AIB next found that there was no evidence of discrimination by the plaintiff against the complainants with respect to the exams. *Id.* at 34. And conclusion three stated that the West Texas VA was not following the current policy, which does not require physical exams of all employees driving government vehicles. *Id.*

Finally, and most pertinently, the AIB concluded that the plaintiff's "leadership style . . . and his lack of emotional intelligence has created an uncomfortable working relationship with many employees at [the West Texas VA]." *Id.* The report supported this conclusion by stating that the plaintiff's co-workers had described him as a "bully" and described his leadership style as "gruff, hard[-]handed, . . . autocratic, arrogant, abrasive, ugly, [dictatorial,][2] and demeaning." *Id.* And some of his co-workers opined that other employees had left the West Texas VA because of their experience working with the plaintiff. *Id.* The report also noted that the plaintiff "tends to speak in a demeaning tone and fashion to subordinates" and "lacks an awareness of how his actions and words affect

---

[2] The AIB report's fourth conclusion and the plaintiff's demotion letter use the word "doctorial." The parties agree this is a typo and should read "dictatorial," as stated in the AIB's factual findings. *See* Dkt. Nos. 33 at 15 n.8; 43 at 16; *see also* Dkt. Nos. 29-3 at 31, 34, 44; 38-2 at 78.

those around him." *Id.* Finally, the AIB concluded that the plaintiff "deflect[s] any criticism" of his workplace demeanor and instead blames his co-workers. *Id.* at 35.

Based on these conclusions, the AIB made various recommendations. *See id.* at 35–36. Important here, the AIB recommended that the plaintiff participate in sensitivity training to, among other things, become "more aware of . . . how his actions and words affect others." *Id.* at 35. The board also recommended that the plaintiff undergo leadership training if he was to continue in a leadership position. *Id.* Notably, the AIB stated that "[the plaintiff] appears to lack the skills necessary . . . to exemplify [the] VA's goal of [s]ervant [l]eadership." *Id.* at 35.

### E.    Plaintiff's Demotion

Hastings, as the then-Acting Chief of Staff, was responsible for recommending what action, if any, should be taken with respect to the plaintiff in response to the AIB report. Dkt. No. 29-6 at 4. He received and reviewed the report and supporting documentation in May 2018, but he did not immediately decide whether to take action because he had only been at the West Texas VA for a short period of time. *Id.* at 5. Instead, Hastings states that he spent approximately three months getting to know the staff at the West Texas VA and "assess[ing] how well staff interacted with each other at all levels." *Id.* However, the plaintiff contends that Hastings did not have "any direct observatory evidence of [the plaintiff's] performance and[/]or interactions with [the plaintiff's] subordinates or other [West Texas VA] staff." Dkt. No. 29-3 at 59.

In August 2018, Hastings recommended to JangDhari that she permanently demote the plaintiff from his position of Associate Chief of Staff, Ambulatory Care, to Staff Physician—the position he had been temporarily serving in since the allegations against him

arose.  Dkt. No. 29-6 at 6; *see also* Dkt. No. 29-3 at 37–39.  In his written recommendation, Hastings stated that he had "no confidence in [the plaintiff's] ability to lead [the] staff or to refrain . . . from creating an environment that degrades staff and adversely impacts moral[e]."  Dkt. No. 29-3 at 38.  Accordingly, Hastings formally found that the plaintiff had "contributed to the establishment of a hostile work environment" and engaged in "Conduct Unbecoming of a Federal Employee" in violation of the VA's harassment policy.  *Id.* at 44–45.  Hastings proposed that JangDhari permanently demote the plaintiff to the position of Staff Physician.  *Id.*  According to Hastings, he did not consult with JangDhari before making this proposal.  Dkt. No. 29-6 at 6.  Furthermore, Hastings states that his decision to propose the demotion was not motivated by the plaintiff's race, color, national origin, gender, or age.  *Id.* at 9.

As Director, JangDhari was responsible for reviewing Hastings's proposed disciplinary action and the AIB report and supporting documentation to determine whether to sustain the proposal.  Dkt. No. 29-9 at 12.  In addition to the AIB report and documentation, JangDhari testified to personally receiving verbal complaints and anonymous letters from the plaintiff's coworkers claiming that the plaintiff made them "uncomfortable" when they engaged and interacted with the plaintiff.  Dkt. No. 29-10 at 31–33.  Prior to a final decision, the plaintiff provided a written rebuttal to his proposed demotion.  Dkt. No. 29-9 at 13; *see also* Dkt. No. 29-3 at 57–80.  Additionally, JangDhari met with the plaintiff, his attorney, and a Human Resources representative from the West Texas VA to discuss the proposed demotion.  *See* Dkt. No. 29-3 at 48–56.

During the meeting, the plaintiff first described in detail his work history, character, and contributions as a physician at the West Texas VA and stated that he was incorrectly

– 8 –

denied the opportunity to serve as the Chief of Staff. *Id.* at 48–50. JangDhari redirected the

conversation from the plaintiff's work performance to the substance of the charges in his

proposed demotion—that the plaintiff had created a hostile work environment. *See id.* at 51;

*see also id.* at 37. The plaintiff contested the charges, claiming instead that he was subjected

to "workplace [bullying] and misuse of power." *Id.* at 51. More specifically, the plaintiff

stated that certain employees who had made allegations against him had been continually

"rude and contentious," had not followed VA policies, had been counseled by him

regarding their deficiencies at work, had worked "underground to sabotage him," and "had

axes to grind." *Id.* at 51–55. He provided multiple email communications between himself,

these employees, and other VA employees to support these contentions. *See id.* at 60–80.

The plaintiff also asserted that he had never been hostile or shouted at any VA employees.

*Id.* at 56. Moreover, the plaintiff stated that he had not been counseled about his leadership

style in the past other than the Chief of Staff asking about the plaintiff's prior failure to

attend certain meetings. *Id.*

     After considering the AIB report and documentation, the plaintiff's written and oral

responses to the report and proposed disciplinary action, the plaintiff's experience and work

history, the seriousness of the offense, and the aggravating and mitigating factors cited by

Hastings in his proposal, JangDhari sustained the charge against the plaintiff. Dkt. No. 29-9

at 14. She further "found that the penalty of demotion was appropriate and reasonable"

because the plaintiff "held a high leadership position . . . [over] one of the primary, largest

service areas." *Id.* at 15. Additionally, she stated that the plaintiff "must lead by example

because his interpersonal interactions with staff impact both staff and the veterans." *Id.* at

15. JangDhari demoted the plaintiff from Associate Chief of Staff to Staff Physician in

Ambulatory Care Service, effective September 16, 2018, at the age of 53.  Dkt. Nos. 29-1 at 14; 29-3 at 81.  She did not believe a lesser measure was appropriate because, under the plaintiff's leadership, "the facility's performance and efficiency [were] failing."  Dkt. No. 29-9 at 15.

　　　In making this decision, JangDhari—who describes herself as over 40, brown in color, and of Indian national origin—states that she did not discriminate or retaliate against the plaintiff based on his age, gender, race, color, or national origin by implementing the AIB investigation or sustaining the proposed demotion.  *Id.* at 15–16.  Furthermore, she asserts that, at the time of her decision to demote the plaintiff, she did not recall knowing that he had filed a prior EEO complaint in 2017 and, regardless of any notification of this complaint, her actions were not in retaliation for his engagement in any protected activity.  *Id.* at 16.  Likewise, Hastings testified that when making his recommendation to demote the plaintiff, he had no knowledge the plaintiff had filed an EEO complaint or engaged in any protected activity.  Dkt. No. 29-6 at 9.

### F.    Plaintiff's Administrative Complaint

　　　The plaintiff filed a Complaint of Employment Discrimination with the VA's EEO office on February 4, 2019.[3]  Dkt. No. 29-4 at 3.  In his complaint, the plaintiff claimed discrimination based on his race, color, national origin, and age and retaliation for engaging in a protected activity.  *Id.*

---

[3] The plaintiff contends that he filed an administrative complaint on March 19, 2018, prior to his demotion.  *See* Dkt. Nos. 29-12 at 29; 29-13 at 15; 43 at 22.  The plaintiff provides a copy of this complaint, which is signed and dated for March 19, 2018.  Dkt. No. 37-1 at 4.  However, the VA's EEO Program Manager states that this complaint was never filed.  Dkt. No. 29-5 at 1–3.  Instead, the plaintiff filed a complaint with similar allegations on February 4, 2019.  Dkt. No. 29-4 at 1–3.

By letter, the EEO office notified the plaintiff, through his counsel, that it accepted his EEO complaint and characterized it as a hostile work environment claim. *Id.* at 4. More specifically, the letter advised that the plaintiff had stated a series of discrete and non-discrete events that assert he was subjected to a hostile work environment on the bases of his race, color, national origin, and age, and in retaliation for a protected activity. *Id.*

The VA filed a motion in the administrative case requesting summary judgment on the plaintiff's claims, which it enumerated as follows: (1) a hostile work environment claim based on the dates when the plaintiff was allegedly denied the opportunity to serve as Acting Chief of Staff, the investigation of his conduct by the AIB, and his demotion; and (2) a discrimination and/or retaliation claim based on his demotion. *See id.* at 81–95. The administrative judge granted the VA's motion for summary judgment in full, stating it "agree[d] in all material respects with the Agency's articulation of the undisputed facts and legal analysis," *id.* at 98, and entered judgment and a final order in favor of the VA. *Id.* at 96–100. Lastly, the VA issued a final order accepting and implementing the administrative judge's decision. *Id.* at 104–07.

### G.    Plaintiff's Employment Discrimination Suit

Following the VA's final order in the administrative case, the plaintiff filed this suit, alleging the following in the "Claims" section of his complaint: (1) the defendant discriminated against the plaintiff in violation of Title VII by failing to appoint him as Acting Chief of Staff on the basis of his race, color, and national origin; (2) the defendant harassed the plaintiff on the basis of his race, color, and national origin and retaliated against him for engaging in a protected activity by subjecting him to an "unmerited fact-finding investigation" by the AIB; and (3) the defendant discriminated against the

– 11 –

plaintiff by demoting him on the basis of his race, color, and national origin and in retaliation for engaging in a protected activity.  *See* Dkt. No. 1 ¶¶ 32–34.  Additionally, the plaintiff alleged that he was discriminated against based on his gender and age in his description of the "Nature of the Case."  *Id.* ¶ 2.

The defendant filed a motion seeking summary judgment on only the plaintiff's first claim—the discrimination claim for failure to appoint him as Acting Chief of Staff.  *See generally* Dkt. Nos. 16–18.  The Court granted summary judgment on this claim for failure to exhaust administrative remedies.  Dkt. No. 25.  The defendant then obtained leave and filed this second motion for summary judgment on the plaintiff's remaining claims.  *See* Dkt. Nos. 28–32.  The plaintiff timely responded, Dkt. No. 36, and the defendant replied, Dkt. No. 44.  The motion is now ripe for review.

## 2.    Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party."  *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  The moving party "bears the initial responsibility of demonstrating the absence of a genuine issue of material fact," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and "identifying those portions of [the record] which it believes demonstrate [that] absence."  *Celotex Corp.*, 477 U.S. at 323.

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "A fact 'is material if its resolution could affect the outcome of the action.'" *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs.*, 627 F.3d 134, 134 (5th Cir. 2010)). The Court must consider materials cited by the parties, but it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (quoting *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant, however, does not need to "*negate* the elements of the nonmovant's case." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis in original) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v.*

– 13 –

*United States*, 600 F.3d 362, 371 (5th Cir. 2010).  Rather, the nonmovant must identify specific evidence in the record and articulate how the evidence supports its claim.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014); *see also* Fed. R. Civ. P. 56(c)(1)(A).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075).  Additionally, Rule 56 does not impose a duty on the Court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

"A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists."  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citation omitted).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## B.    Title VII and ADEA Employment Discrimination and Retaliation

Under Title VII, "[a]ll personnel actions affecting [federal government] employees . . . shall be made free from any discrimination based on race, color, religion,

– 14 –

sex, or national origin." 42 U.S.C. § 2000e-16(a). Similarly, the ADEA requires that personnel actions affecting federal employees over the age of 40 "be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

A plaintiff may prove discrimination by either "direct or circumstantial evidence, or both." *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1065 (5th Cir. 2023) (citation omitted). The Fifth Circuit analyzes Title VII and ADEA claims relying on circumstantial evidence under the familiar *McDonnell-Douglas* burden-shifting test. *See Heggemeier v. Caldwell Cnty.*, 826 F.3d 861, 867 (5th Cir. 2016) (Title VII); *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (retaliation); *Chhim v. City of Houston*, No. 20-20568, 2021 WL 5045432, at *1 (5th Cir. Oct. 29, 2021) (ADEA) (citing *Nicholson v. Securitas Sec. Servs., USA, Inc.*, 830 F.3d 186, 189 (5th Cir. 2016). To survive summary judgment under the *McDonnell-Douglas* framework, the plaintiff must first state a prima facie case of discrimination or retaliation. *Heggemeier*, 826 F.3d at 867. "Establishment of [a] prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Dittmar v. 3M Co.*, No. 6:21-CV-043-H, 2022 WL 17858071, at *5 (N.D. Tex. Dec. 22, 2022) (Hendrix, J.) (alteration in original) (quoting *Tex. Dep't of Cnty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)).

If the plaintiff meets his initial burden of satisfying the elements of the prima facie case, then the burden of production shifts to the defendant to establish a "legitimate, non-discriminatory reason" for its adverse employment action. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000)). To meet this burden, the defendant "must provide both 'clear and reasonably specific reasons' for its actions," *id.* at 513 (quoting *Burdine*, 450 U.S.

at 258), using admissible evidence to support the defendant's nondiscriminatory reason, *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016); *Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 868 (5th Cir. 2010). "If the employer is able to articulate a reason, 'the presumption raised by the prima facie case is rebutted and drops from the case.'" *Squyres v. Heico Cos.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

If the defendant satisfies this burden, "then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (citations omitted). Under both acts, "the employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons[] but were a pretext for discrimination [or retaliation].'" *Squyres*, 782 F.3d at 231 (quoting *Reeves*, 530 U.S. at 143).

3.    **Analysis**

The Court grants summary judgment on the plaintiff's remaining claims for discrimination based on race, color, national origin, gender, and age and retaliation for engaging in a protected activity.[4]

First, the Court finds that, even if the plaintiff could establish a prima facie case for discrimination, he cannot show that a genuine issue of fact exists as to whether the defendant's legitimate, nondiscriminatory reasons for the investigation and demotion are a pretext for discrimination. Next, to the extent the plaintiff has properly asserted a claim for harassment that created a hostile work environment, the Court finds that the plaintiff cannot establish his prima facie case. The plaintiff has not presented evidence that creates an issue of fact as to whether the plaintiff experienced actionable harassment or that any such harassment was based on a protected characteristic. Finally, like his discrimination claims,

---

[4] The plaintiff's factual allegations remain consistent throughout the administrative process and the filing of this lawsuit, but his alleged bases for discrimination vary. In his complaint's introduction, the plaintiff alleges employment discrimination based on race, color, sex, national origin, and age and employment retaliation. Dkt. No. 1 ¶ 2. The plaintiff also references both Title VII and the ADEA. *Id.* Then, in the section labeled "Claims," the plaintiff alleges employment discrimination based only on race, color, and national origin, and employment retaliation, all in violation of Title VII. *Id.* ¶¶ 32–34. However, in the plaintiff's formal EEO complaint, the plaintiff alleged national origin, race, color, and age as bases for the alleged employment discrimination. Dkt. No. 29-4 at 3. The defendant acknowledges that the plaintiff now asserts gender as a basis for discrimination in his complaint despite the fact that the EEO complaint did not assert gender discrimination. *See* Dkt. No. 33 at 19 n.1. But the defendant does not seek dismissal of this claim based on failure to exhaust administrative remedies. *See id.*

The Fifth Circuit liberally construes EEO complaints when determining administrative exhaustion, and "a Title VII lawsuit may include allegations 'like or related to allegation[s] contained in the [EEO] charge and growing out of such allegations during the pendency of the case before the [EEO] agency.'" *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)). And, as the alleged personnel actions are the same for all bases of discrimination and retaliation, the analysis of the plaintiff's gender as a basis for discrimination is essentially identical to the analysis of the other bases asserted by the plaintiff. For all of these reasons, the Court evaluates gender in addition to race, color, national origin, and age as a basis for the alleged discrimination.

the Court finds that the plaintiff cannot establish that the defendant's legitimate, nondiscriminatory reasons for the investigation and his demotion were a pretext for retaliatory motives.

### A.    The Court grants summary judgment on the plaintiff's discrimination claims.

To establish a prima facie case of discrimination based on any of the protected characteristics under Title VII, the plaintiff must show "that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, . . . that other similarly situated employees were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004); *see also Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).  Similarly, the ADEA requires a plaintiff to establish that he: "(1) [is] within the protected class; (2) [is] qualified for the position; (3) . . . suffered an adverse employment decision; and (4) [was] replaced by someone younger or treated less favorably than similarly situated younger employees (i.e., suffered from disparate treatment . . . )." *Smith v. City of Jackson*, 351 F.3d 183, 196 (5th Cir. 2003), *aff'd on other grounds*, 544 U.S. 228 (2005).  Additionally, where an employee suffers an adverse employment action for violating a work rule, apart from showing disparate treatment, he may also establish the final element of his prima facie case under either Title VII or the ADEA by showing he did not violate the work rule.[5]  *Turner v. Kan. City S. Ry.*

---

[5] Although the defendant conflates the two ideas, Dkt. No. 44 at 4 n.4, it is clear that a plaintiff can establish a prima facie case of discrimination by showing either disparate treatment of similarly situated employees or that he did not violate the rule for which he was disciplined.  *See Mayberry*, 55 F.3d at 1090–91 (evaluating both bases separately to determine whether the plaintiff established a prima facie case of discrimination).

*Co.*, 675 F.3d 887, 892–93 (5th Cir. 2012) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)) (analyzing a work-rule violation argument in a Title VII case); *Chester v. Directv, L.L.C.*, 683 F. App'x 344, 347–48 (5th Cir. 2017) (citing *Mayberry* and analyzing a work-rule violation argument in an ADEA case).

### i.    The Court assumes without deciding that the plaintiff has established a prima facie case of discrimination.

The defendant disputes two elements of the plaintiff's prima facie case. Dkt. No. 33 at 26. First, the defendant alleges that the plaintiff has not shown that he is qualified for the position from which he was demoted. *Id.* Additionally, the defendant contends that the plaintiff cannot show that he was replaced by someone outside of his protected class or that similarly situated employees outside of the protected class were treated more favorably. *Id.* In response, the plaintiff contends that he is qualified for the position, that he was replaced by someone outside of his protected class, and that he can establish the final element in his prima facie case because he did not violate the work rule that the defendant asserts as a reason for his demotion. *See* Dkt. No. 43 at 17–19.

Because the Court finds that the plaintiff's discrimination claims fail at the pretext stage of the *McDonnell-Douglas* analysis, the Court assumes without deciding that the plaintiff has established his prima facie case of discrimination under both Title VII and the ADEA. *See Moore v. Miss. Dept. of Hum. Servs.*, 6 F. Supp. 3d 713, 716 (S.D. Miss. 2014); *Lacy v. Dall. Cowboys Football Club*, No. 3:11-CV-300-B, 2012 WL 2795979, at *7 (N.D. Tex. July 10, 2012). Accordingly, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the demotion. *Okoye*, 245 F.3d at 512.

### ii.    The Court finds that the defendant has proffered legitimate, nondiscriminatory reasons for demoting the plaintiff.

"While the defendant is not required to 'persuade the court that it was actually motivated by the proffered reasons,' in order to satisfy its burden, 'the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [its decision].'" *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 900 (5th Cir. Mar. 23, 2012, revised June 22, 2012) (quoting *Burdine*, 450 U.S. at 254–55). This Court has previously noted that "[t]he Fifth Circuit has recognized that poor leadership is a legitimate, nondiscriminatory reason for terminating a plaintiff." *Dittmar*, 2022 WL 17858071, at *7 (first citing *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 (5th Cir. 1997); and then citing *Casarez v. Burlington N./Santa Fe. Co.*, 193 F.3d 334, 337 (5th Cir. 1999)). Additionally, the Fifth Circuit has recognized "violation of [a] workplace policy," *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012), and "complaints from [a plaintiff's] coworkers about [his] workplace behavior," as legitimate nondiscriminatory reasons for an adverse employment action, *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 620 (5th Cir. 2020).

The defendant contends that the AIB's findings with respect to the plaintiff's behavior at work—namely, that his "leadership style" and "lack of emotional intelligence . . . created an uncomfortable working relationship with many of the employees"—constitute legitimate, nondiscriminatory reasons for his demotion. Dkt. Nos. 29-3 at 34; 33 at 31. Furthermore, the demotion proposal and confirmation letters stated that, after reviewing the AIB's findings, the supporting documentation, and—in Hastings's case—personally observing the staff, both Hastings and JangDhari determined that the plaintiff's workplace behavior violated the West Texas VA's harassment policy. Dkt. No. 33 at 31–34. And JangDhari testified to personally receiving verbal complaints and

– 20 –

anonymous letters from the plaintiff's coworkers claiming that the plaintiff made them "uncomfortable" when they engaged and interacted with the plaintiff. Dkt. No. 29-10 at 31–33. Thus, because the defendant cites the plaintiff's leadership style, supported by the complaints of his coworkers, and the determination that the plaintiff's conduct violated a work policy, the Court finds that the defendant has proffered legitimate, nondiscriminatory reasons for the decision to demote the plaintiff. *See Badgerow*, 974 F.3d at 620; *Hernandez*, 670 F.3d at 658; *Dittmar*, 2022 WL 17858071, at *7.

The plaintiff argues that the reasons given for his demotion are "patently false" and "not articulated by [JangDhari] in response to direct questions." Dkt. No. 43 at 24. The plaintiff specifically takes issue with JangDhari's written discovery answers when asked why she demoted the plaintiff. *Id.* at 25. The plaintiff argues that, because JangDhari stated her decision was supported by the evidence in the AIB report and supporting documentation instead of specifying the plaintiff's conduct that led to his demotion, "[t]he defendant has not pointed to any admissible evidence to back up that [the plaintiff] was fired for" his leadership style, complaints about his workplace behavior, or violation of the harassment policy. *Id.*

This argument is untenable. JangDhari made the final decision to demote the plaintiff in September 2018 after reviewing the AIB report and supporting documentation. Dkt. No. 29-3 at 81. The statements to which the plaintiff refers regarding JangDhari's reason for sustaining the proposed demotion occurred in May 2019 and July 2022, months and years after she made the decision. *See* Dkt. Nos. 38-1 at 2, 9–10; 38-2 at 24, 26. They do not conflict with her initial, articulated reason for her decision. Rather, she refers to the same evidence she reviewed at the time of her decision and states she would "have to review

– 21 –

the evidence file at this time" to recall the precise information that led to her decision. Dkt. No. 38-1 at 8. And directly after these statements, JangDhari confirms that it was the plaintiff's conduct as supported by the evidence she reviewed in the file that led to her decision to demote, but she did not "remember what was in the evidence file . . . off the top of [her] head." *Id.* at 10. That JangDhari could not remember the specifics of a file she reviewed months and years prior to her testimony does not negate the legitimate, nondiscriminatory reasons for the demotion given by the defendant and supported by admissible evidence made at or near the time of the decision. *Cf. Sanchez v. City of San Antonio*, No. 5:18-CV-184, 2019 WL 2165811, *18 (W.D. Tex. May 17, 2019) (finding that minor inconsistencies in testimony of individuals who may not recall details after the passage of more than two years "do not tend to establish the falsity of [the defendant's] legitimate, nondiscriminatory reason").

Thus, the Court finds that the defendant has proffered legitimate, nondiscriminatory reasons for the demotion and turns to the final stage of the *McDonnell-Douglas* analysis—whether the plaintiff can raise a genuine issue of fact that these reasons were not true and instead were a pretext for discrimination. *Squyres*, 782 F.3d at 231.

   **iii. The Court finds that the plaintiff cannot raise a genuine issue of fact that the defendant's proffered reasons are a pretext for discrimination.**

"An employee can show pretext 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Id.* (quoting *Moss v. BMC Software, Inc.,* 610 F.3d 917, 922 (5th Cir. 2010)). To ultimately prevail, the plaintiff must demonstrate "but for" causation—that the defendant would not have taken the adverse employment action but for the plaintiff's membership in the

protected class. *Id.*; *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir. 2022). The defendant does not have to show that the proffered reasons for the adverse employment action were objectively true but, rather, "the inquiry is limited to whether the employer believed the allegation in good faith and whether the [adverse employment] decision . . . was based on that belief." *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020) (quoting *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993)).

"An employee seeking to show pretext must rebut each discrete reason proffered by the employer." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015). Moreover, "[t]o establish pretext, a plaintiff cannot merely rely on his subjective belief that discrimination has occurred; rather, he has the ultimate burden of persuasion in proving intentional discrimination throughout the case." *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997).

### a. The defendant's proffered reasons for the demotion are consistent.

The plaintiff first claims that a fact issue exists as to pretext because JangDhari's demotion letter "misrepresents" that the AIB found the plaintiff's "mannerism was gruff, hard[-]handed, bully-like, autocratic, arrogant, abrasive, ugly, [dictatorial], and demeaning that degraded staff and moral[e]." Dkt. No. 43 at 26 (quoting Dkt. No. 37-1 at 26). He also contends that JangDhari's letter misstated that the AIB found that the plaintiff had violated the VA's harassment policy. *Id.* According to the plaintiff, these discrepancies render the defendant's proffered reasons for demotion "unworthy of credence." *Id.* (citation omitted).

In fact, the plaintiff is correct that the AIB report did not make a finding that the plaintiff's mannerisms were "gruff, hard[-]handed, bully-like, autocratic, arrogant, abrasive, ugly, [dictatorial], and demeaning that degraded staff and morale," but instead stated that

the plaintiff's leadership style "was described" by his coworkers using these adjectives.  Dkt.
No. 29-3 at 31, 34.  The report also stated that the plaintiff's leadership style in conjunction
with "his lack of emotional intelligence has created an uncomfortable working relationship
with many of the employees . . . ."  *Id.* at 34.  JangDhari's demotion letter, on the other
hand, stated that the AIB "found that [the plaintiff's] actions contributed to the
establishment of a hostile work environment" and "found that [the plaintiff's] mannerism
was gruff, hard[-]handed, bully-like, autocratic, arrogant, abrasive, ugly, [dictatorial], and
demeaning, which degraded staff and moral[e]."  Dkt. No. 29-3 at 81.  Then, JangDhari
stated that the plaintiff's conduct violated the workplace harassment policy.  *Id.*  She did
not, contrary to the plaintiff's assertion, state that the AIB found such policy violation.  *Id.*

      "Generally, 'an employer's inconsistent explanations for its employment decisions at
different times permits a jury to infer that the employer's proffered reasons are pretextual.'"
*Squyres*, 782 F.3d at 234 (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d
408, 412 n.11 (5th Cir.2007)).  For example, in *Burton*, the Fifth Circuit found that a fact
issue remained as to pretext because there was conflicting evidence as to whether the
individual who made the adverse employment decision had knowledge of the proffered
reason for the decision.  798 F.3d at 236.  Similarly, in *Gee v. Principi*, 289 F.3d 342 (5th Cir.
2002), the Fifth Circuit found an issue of fact as to the truthfulness of the proffered reasons
for a plaintiff's discharge when a decisionmaker's testimony—given twice at different
times—conflicted as to the participants and issues involved in a meeting about the plaintiff's
discharge.  *Id.* at 347–48.  And in *Burrell*, the Fifth Circuit found possible pretext when an
employer, at different times over the course of the case, proffered two different areas of

deficiency in the plaintiff's performance as reasons for failing to promote the plaintiff. 482 F.3d at 415.

However, in this case, "when the alleged inconsistent statements are considered in their full context, the inconsistencies disappear." *Squyres*, 782 F.3d at 234. The Court finds that there is no fact issue as to whether the defendant's proffered reasons are a pretext for discrimination because, unlike *Burton*, *Gee*, and *Burrell*, "[t]he statements are not so inconsistent as to raise a question of fact as to whether the reasons [the defendant] has offered are worthy of credence." *Squyres v. Heico Cos.*, No. 3:12-CV-2348-B, 2013 WL 6027387, at *10 (N.D. Tex. Nov. 13, 2013), *aff'd*, 782 F.3d 224 (5th Cir. 2015). In short, the defendant's reasons given for the demotion have not changed and are well-supported by the record. First, Hastings, who initially proposed the demotion, made almost identical misstatements of the AIB's findings in his proposal. *Compare* Dkt. No. 37-1 at 23 *with id.* at 26. And in his interrogatory responses in the administrative process, Hastings stated that "[the] proposed demotion was due to the AIB results showing evidence of bullying and harassing behavior by the [plaintiff] to his direct reports and to others in the facility." Dkt. No. 38-2 at 13. Likewise, his declaration and deposition testimony, both in this case and the administrative case, state similar reasons for the demotion. *See* Dkt. No. 29-6 at 6–9; 29-7 at 23–24; 29-8 at 88–89. Hastings also testified that, in his opinion, an "uncomfortable working relationship" could also qualify as a "hostile work environment." Dkt. No. 29-8 at 71. Likewise, JangDhari's deposition testimony, declaration, and answers to interrogatories support her contention that the plaintiff was demoted because she found, in part based on the AIB report, that his interactions with his coworkers contributed to a hostile work

environment.  *See* Dkt. No. 29-9 at 9, 13–15; 29-10 at 83, 85–86, 95; 29-11 at 55–58; 38-2 at 24.

That Hastings and JangDhari categorized the AIB's description of the plaintiff's leadership style as a "finding" and used the ostensibly harsher term "hostile work environment" does not change that the defendant has consistently stated that the plaintiff was demoted based on his leadership style and interactions with his coworkers that, in their determination, contributed to a hostile work environment.  In sum, "statements [in the AIB report] do conflict slightly with [JangDhari's and Hastings's demotion letters], but not enough to raise a question as to mendacity or fabrication" of the reasons given for the plaintiff's demotion.  *Squyres*, 2013 WL 6027387, at *10.  Thus, the plaintiff has failed to show a genuine issue of material fact as to whether the defendant's proffered reasons for demotion are true based on the alleged misrepresentations in her letter of demotion.

> **b.**    **The defendant did not violate the West Texas VA's disciplinary procedures.**

The plaintiff next contends that JangDhari inappropriately demoted the plaintiff before employing lesser disciplinary actions in violation of the VA's procedures.  Dkt. No. 43 at 26.  The VA's disciplinary policy states that, "[d]isciplinary or major adverse actions will be taken when it is evident that other supervisory techniques have failed to correct a given problem[] or would be inappropriate."  Dkt. No. 38-2 at 57.  It also defines various disciplinary actions, such as admonishment and reprimand, as distinguished from major adverse actions, such as demotion.  *Id.* at 57–58.  However, nothing in the policy requires an employee be given a lesser disciplinary action prior to implementing a major adverse action. *See id.* at 56–67.  Instead, the policy requires that the VA take "prompt and appropriate[] disciplinary or major adverse action" depending on what the circumstances merit.  *Id.* at 57.

And here, JangDhari testified that she believed lesser disciplinary measures would be insufficient because the plaintiff's area of oversight had been failing for several years under the plaintiff's leadership.  Dkt. No. 29-9 at 15.

And even if JangDhari had failed to follow the disciplinary procedures, the Fifth Circuit "does not find discriminatory motive merely because an employer misapplies a . . . policy."  *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460 (5th Cir. 2019) (collecting cases).  Even a showing that an employer intentionally failed to follow its own disciplinary procedures is not enough to show that the employer's proffered nondiscriminatory reasons are a pretext for discrimination.  *Id.*  Thus, even accepting the plaintiff's contention that the defendant failed to follow its own disciplinary procedures fails to create a fact issue as to whether the defendant's legitimate, nondiscriminatory reasons for his demotion are true.

### c.    The subjective beliefs of the plaintiff's coworkers are insufficient to establish pretext.

Finally, the plaintiff attempts to establish pretext by offering an email and the interrogatory responses of two coworkers, Mancha and Grant.  Dkt. No. 43 at 27–29. Mancha stated that she "believe[s] that [the plaintiff] has been treated unfairly because of his race and gender."  Dkt. No. 38-2 at 36.  Mancha also provides the following examples that support her belief: (1) the plaintiff was "interrupted and cut off" in a meeting by Chitwood and JangDhari,[6] *id.* at 33; (2) the plaintiff was admonished for failing to recall information in a meeting and the Acting Chief of Staff (presumably Chitwood) was not, *id.*; (3) the

---

[6] Mancha refers to the "Director" and "Acting Chief of Staff, Ambulatory Service" in her interrogatory responses, created in June 2019.  Dkt. No. 38-2 at 33.  At that time, JangDhari was the Director and Chitwood was the Acting Chief of Staff, Ambulatory Service.  *See* Dkt. Nos. 38-1 at 22–23; 38-2 at 17.

plaintiff was blamed by the Director for inadequate staff when Chitwood was not, *id.* at 33, 36; (4) the Chief of Pharmacy and Group Practice Manager blamed the plaintiff for the lack of physicians, *id.* at 33; (5) the plaintiff's request to add a cardiology clinic was denied but implemented under a different Chief of Staff, *id.*; and (6) she believes the different treatment of Chitwood and the plaintiff "could be [based on] racial bias," *id.* at 36.  Another employee, Grant, stated that JangDhari treated the plaintiff and Chitwood "quite different" with respect to "leave requests, job duties, . . . [and] extra duties and expectations."  *Id.* at 5. But she also stated that she "does not know if it is because of his skin color or because he is a man."  *Id.*

        In short, the plaintiff has presented no evidence "beyond his own speculation and that of [his coworkers]" that the alleged mistreatment of the plaintiff was motivated by his race or gender.  *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1067 (5th Cir. 2023); *see also Crabb v. Wal-Mart Stores, Inc.*, No. 1:11CV44-SA-DAS, 2012 WL 4092427, at *9 (N.D. Miss. Sept. 17, 2012) ("[I]ndividual testimony that they were treated differently based on their race is unavailing as the court has held such hollow assertions are insufficient[.]").  "And [Fifth Circuit] caselaw is clear that 'subjective belief of racial motivation, without more, is not sufficient.'"  *Price*, 88 F.4th at 1067 (quoting *Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 F. App'x 104, 106–07 (5th Cir. 2009)).  Moreover, whether the beliefs belong to someone other than the plaintiff is inconsequential.  *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 553 (S.D. Tex. 1999), *aff'd*, 224 F.3d 765 (5th Cir. 2000).  "When, as here, an employee does not adduce objective evidence refuting the rational reasons articulated by the employer, pretext cannot be established by subjective beliefs that discrimination motivated the employer's actions."  *Id.* at 553–54.

Thus, because this evidence amounts only to the plaintiff's coworkers' subjective beliefs of what "could" be racial or gender bias, *see* Dkt. No. 38-2 at 5, 36, Mancha's and Grant's statements are insufficient to create a genuine issue of material fact as to whether the defendant's proffered reasons for the plaintiff's demotion are true.

* * *

In sum, the plaintiff has failed to present evidence that creates a genuine issue of material fact as to whether the defendant's demotion was motivated by his race, color, national origin, gender, or age. Accordingly, because the claims ultimately fail at the pretext stage, the Court grants summary judgment in favor of the defendant on the plaintiff's discrimination claims under Title VII and the ADEA.

### B.    The Court grants summary judgment on the plaintiff's harassment (hostile work environment) claims.

With respect to his harassment claim, the plaintiff asserts that the defendant "subjected [the] plaintiff to an unmerited fact-finding investigation and otherwise harassed the plaintiff" based on his race, color, national origin, gender, and age, and in retaliation for engaging in a protected activity. Dkt. No. 1 ¶¶ 2, 33. The defendant argues that the plaintiff has not established a prima facie case for a hostile work environment claim under either Title VII or the ADEA. *See generally* Dkt. No. 33 at 39–47. According to the defendant, the plaintiff's contentions that the defendant investigated the allegations of sexual harassment made against the plaintiff, demoted the plaintiff, and engaged in rude and belittling behavior towards the plaintiff, even if taken as true, are not enough to create a hostile work environment as a matter of law. *See id.*

In his response, the plaintiff directly addresses only his discrimination and retaliation claims, and he does not respond to the defendant's arguments regarding a hostile work

environment claim.  *See generally* Dkt. No. 43.  In fact, the only references to harassment in the plaintiff's response are general allegations that "discrimination, harassment, and/or retaliation occurred on March 5, 2018."  *Id.* at 21.  In support, the plaintiff cites to the letter informing him of the AIB investigation, Dkt. No. 37-1 at 2, and the EEO complaint that the defendant contends was never formally filed, which states that JangDhari harassed him by "contradicting" the "work direction" given by another supervisor and making it "unbearable" to come to work on a "daily basis," *see id.* at 4; *see also* Dkt. No. 43 at 21.

The plaintiff also cites to the comments by Grant and Mancha—who allegedly believed that the plaintiff had been harassed by JangDhari and/or Chitwood.  Dkt. No. 43 at 27–29.  Grant stated that she witnessed JangDhari yelling at Sotonwa after a meeting and noticed that JangDhari treated Sotonwa "quite different[ly]" from Chitwood.  Dkt. No. 38-2 at 4–5.  But, as noted *supra*, Analysis § 3.A.iii.c., within the same document that contains these written statements, Grant noted that she "do[es] not know if [this alleged treatment of the plaintiff] is because of his skin color or because he is a man."  *Id.* at 5.  And Mancha stated she believed that the disparate treatment of Sotonwa could be due to race and gender. Dkt. No. 38-2 at 36.  However, the instances she gave of disparate treatment are JangDhari and Chitwood interrupting, blaming, and "chatis[ing]" the plaintiff, and declining to adopt one of the plaintiff's business proposals.  *See id.* at 33–34, 36.

Based on these allegations, the Court finds that the plaintiff fails to raise a genuine issue of material fact to prove a harassment claim for a hostile work environment under either Title VII or the ADEA.  To establish a hostile work environment under Title VII, a plaintiff must show, among other elements, that "[he] was subjected to unwelcome harassment" and "the harassment complained of was based on [his membership in the

protected class].” *Arredondo v. Elwood Staffing Servs., Inc.*, 81 F.4th 419, 433 (5th Cir. 2023) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). “Only ‘sufficiently severe or pervasive’ behavior that ‘alter[s] the conditions of the victim’s employment and create[s] an abusive environment’ constitutes a . . . hostile working environment under Title VII.” *Id.* (alterations in original) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). Additionally, the environment must be both subjectively and objectively hostile to be actionable. *Id.* Similarly, to establish a hostile work environment claim under the ADEA, the plaintiff must prove that “the employee was subjected to harassment, either through words or actions, based on age” and “the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment.” *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011).

When determining whether a plaintiff has established a hostile work environment, courts look to the totality of the circumstances. *Harris*, 510 U.S. at 23. These circumstances “may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” *Id.* The Fifth Circuit “test—whether the harassment is severe or pervasive—is stated in the disjunctive.” *Lauderdale v. Tex. Dep’t of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). Thus, “[f]requent incidents of harassment, though not severe, can reach the level of ‘pervasive,’ thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists.” *Id.*

Here, the plaintiff has not provided competent evidence that the alleged harassment was severe or pervasive enough to raise a genuine issue of fact that would meet the Fifth

Circuit standard.  With respect to the severity of treatment by coworkers or supervisors, the Fifth Circuit has held that, in a hostile work environment claim, "[a]llegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation."  *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 923 (5th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023) (quoting *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019)). Moreover, the Fifth Circuit has rejected a comparable claim where a supervisor interrupted the plaintiff when speaking and yelled degrading and chastising comments at her.  *Saketkoo*, 31 F.4th at 1003–04.  Thus, the plaintiff's and other employees' complaints that JangDhari and Chitwood yelled at, berated, blamed, and unfairly treated the plaintiff do not rise to the required level of severity.  These alleged incidents fall well short of the Fifth Circuit's standard.  *Cf. Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 400–04 (5th Cir. 2021) (finding a genuine issue of fact as to whether harassment was sufficiently severe when a plaintiff offered evidence that coworkers periodically called him "deeply degrading racial epithets," hid his applications for a promotion, and gave him less-desirable work assignments).

With respect to pervasiveness, the plaintiff's allegation of harassment on "an almost daily basis" is wholly conclusory, and the plaintiff's coworkers are no more specific as to the frequency of such conduct.  *See* Dkt. Nos. 37-1 at 4; 38-2 at 4–5, 36.  In *Saketkoo*, Fifth Circuit found that the "sporadic and abrasive" conduct of a supervisor who irregularly yelled at the plaintiff was not pervasive enough to evidence a hostile work environment. 31 F.4th at 1003–04.  In doing so, the Fifth Circuit cited to a district court case (also affirmed by the Fifth Circuit) that "[held that the] plaintiff failed to establish a hostile work environment where the employer was 'always hostile [and] threatening,' screamed at [the]

plaintiff, and violated [the] plaintiff's space by slamming files and doors." *Saketkoo*, 31 F.4th at 1004 n.9 (citing *Pennington v. Tex. Dep't of Fam. & Protective Servs.*, No. A-09-CA-287-SS, 2010 WL 11519268, at *10 (W.D. Tex. Nov. 23, 2010), *aff'd*, 469 F. App'x 332 (5th Cir. 2012)). Thus, the plaintiff's allegations of "similarly sporadic and abrasive conduct" are not sufficient summary judgment evidence that would show the frequency of the alleged harassment rose to the level of pervasive. *Saketkoo*, 31 F.4th at 1004; *see also* Dkt. Nos. 29-4 at 3; 38-2 at 4–5, 36.

Finally, with respect to all incidents of alleged harassment, "[the p]laintiff fails to argue or reference any evidence of how any of this alleged harassment was connected to, based on, or related to" his membership in any protected class. *Smith v. Home Depot U.S.A., Inc.*, 102 F. Supp. 3d 867, 883 (E.D. La. 2015); *see also Saketkoo*, 31 F.4th at 1004. Although the plaintiff's demotion clearly altered the conditions of his employment, there is no evidence—other than subjective beliefs—that the demotion was in any way motivated by the plaintiff's race, color, national origin, gender, or age. *See supra* Analysis § 3.A.iii.c. Furthermore, the AIB investigation was in response to employee complaints of sexual harassment against the plaintiff, and there is no evidence that anything other than the defendant's duty to investigate the allegations motivated the inquiry.[7] Thus, even if the evidence could raise an issue of severe or pervasive behavior, the harassment claim still fails for this independent reason.

---

[7] Furthermore, had the defendant failed to take "prompt remedial action" upon notice of the harassment allegations against the plaintiff, it could have risked a harassment claim from the employees making the allegations. *See Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (quoting *Hernandez*, 670 F.3d at 651).

In sum, the plaintiff failed to address any harassment claim in his response to the motion for summary judgment, and the complaint and evidence contain only conclusory allegations of sporadic and relatively mild allegations of harassment and no evidence that the alleged conduct was discriminatory. Thus, the Court finds that there is no genuine issue of material fact as to whether the plaintiff was harassed based on his race, color, national original, gender, or age to the extent that it created a hostile work environment. The Court grants summary judgment on any harassment claims.

### C. The Court grants summary judgment on the plaintiff's retaliation claims.

Finally, to establish a prima facie case for retaliation, the plaintiff must show that "(1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Johnson v. Bd. of Supervisors*, 90 F.4th 449, 460 (5th Cir. 2024) (quoting *Saketkoo*, 31 F.4th at 1000). Because the plaintiff has no direct evidence of retaliation and attempts instead to prove causation using circumstantial evidence, the *McDonnell-Douglas* burden-shifting framework applies. *Id.*

The parties dispute whether the plaintiff can establish the third element of a prima facie case. Dkt. Nos. 33 at 48–50; 43 at 20–23. In brief, the parties disagree as to whether: (1) the plaintiff engaged in a protected activity in March 2018 at or near the time of the investigation and his demotion; and (2) whether his first EEO complaint in 2017 or the alleged complaint in 2018 was temporally close enough to the investigation and demotion to establish a causal connection. *Id.* The plaintiff contends that he filed a formal EEO complaint in March 2018—the same month the AIB investigation began and he was temporarily removed from his position. Dkt. Nos. 37-1 at 4; 43 at 22. The defendant's

– 34 –

EEO agency contends that, other than the 2017 complaint about the plaintiff's pay differential, the plaintiff did not file any complaint—formal or informal—until February 2019, after the investigation and his demotion.  Dkt. Nos. 33 at 49 n.21; 29-5 at 2–3.  But the Court need not resolve whether the plaintiff satisfies the causal-connection element of his prima facie case because he cannot ultimately prevail at the pretext stage of the analysis.

At the pretext stage of the *McDonnell-Douglas* framework, the plaintiff must show more than the causal connection required for the prima facie case.  He must show that his protected activity "was a 'but for' cause of the adverse employment decision."  *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).  That is, a plaintiff must show that "a discriminatory motive more likely motivated [the] employer's decision" than the stated legitimate, nondiscriminatory reason.  *Saketkoo*, 31 F.4th at 1002 (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020)).  "A 'combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment'" in a retaliation action.  *Id.* at 1003 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

However, mere speculation is not evidence of pretext.  *See Johnson*, 90 F.4th at 461 ("Speculation that she could have been assigned another room, however, does not demonstrate that [the employer's] reasons for assigning [the plaintiff to work in] the storage room were pretextual.").  The parties dispute whether JangDhari considered the plaintiff's complaints of discrimination or harassment at the time she decided to approve Hastings's recommendation to permanently demote the plaintiff.  Dkt. Nos. 33 at 51; 43 at 22–23.  However, the plaintiff only speculates that JangDhari recalled and considered his prior

– 35 –

complaints at the time of her decision and provides no competent summary judgment evidence to support this proposition.  In contrast, the undisputed evidence shows that: (1) the initial recommendation to demote the plaintiff was made by Hastings, who was not aware that the plaintiff had ever engaged in a protected activity, Dkt. No. 29-6 at 9; (2) JangDhari testified that she did not recall knowing about the plaintiff's 2017 EEO complaint, Dkt. No. 29-9 at 16; and (3) even if she were aware, it had "no bearing" on her decision to sustain the proposed demotion.  *Id.*  And both Hastings and JangDhari repeatedly and consistently state that the proposed demotion was based on the results of the AIB's report and the determination that the plaintiff's conduct violated the workplace harassment policy.  *See* Analysis § 3.A.iii.a.

Therefore, regardless of whether the plaintiff filed the 2018 EEO complaint, the 2017 and 2018 complaints were temporally close enough to the investigation and demotion to establish a prima facie case, or JangDhari had knowledge of the plaintiff's complaints, the evidence cannot support the conclusion that the plaintiff's demotion was retaliatory.  First, "close temporal proximity [alone] is insufficient to establish pretext."  *Moore v. Brennan*, 794 F. App'x 374, 379 (5th Cir. 2019) (citing *Garcia v. Prof. Contract Servs., Inc.*, 938 F.3d 236, 243–44 (5th Cir. 2019)).  The plaintiff has provided no "significant evidence of pretext" in addition to any close temporal proximity, and therefore he cannot clear the pretext hurdle. *Saketkoo*, 31 F.4th at 1003; *cf. Moore*, 194 F. App'x at 380 ("Although [the plaintiff] speculates that his managers . . . may have possessed retaliatory animus, his only evidence of this is that they knew of his EEO claims.").  Accordingly, the plaintiff has not raised a genuine issue of fact that, but for his protected activity, he would not have been investigated

or demoted, and the plaintiff's retaliation claims fail as a matter of law.  The Court grants summary judgment on the plaintiff's Title VII and ADEA retaliation claims.

**4.    Conclusion**

In sum, the Court grants summary judgment on the plaintiff's claims.  The plaintiff cannot establish a prima facie case for harassment that constituted a hostile work environment because he cannot establish that the harassment was severe or pervasive, or that he was harassed because of his race, color, national origin, age, or in retaliation for engaging in a protected activity.  And even if the plaintiff could establish a prima facie case of discrimination or retaliation, he has not presented evidence that creates a genuine issue of material fact as to whether the defendant's proffered reasons for the investigation into his conduct and his eventual demotion were a pretext for discrimination or retaliation.

So ordered on October 28, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE